# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————

## No. ACM 39771

————————

## UNITED STATES
*Appellee*

v.

## Ryan J. MICHALEC
Technical Sergeant (E-6), U.S. Air Force, *Appellant*

————————

Appeal from the United States Air Force Trial Judiciary

Decided 26 January 2021

————————

*Military Judge:* Shaun S. Speranza.

*Approved Sentence:* Dishonorable discharge, confinement for 20 years, forfeiture of all pay and allowances, and reduction to E-3. Sentence adjudged 23 May 2019 by GCM convened at Joint Base Charleston, South Carolina.

*For Appellant:* Major Mark J. Schwartz, USAF; Nathan Freeburg, Esquire.

*For Appellee:* Lieutenant Colonel Matthew J. Neil, USAF; Major Jessica L. Delaney, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and MEGINLEY, *Appellate Military Judges.*

Judge MEGINLEY delivered the opinion of the court, in which Senior Judge POSCH and Judge RICHARDSON joined.

————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————

MEGINLEY, Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of one specification of aggravated sexual contact with a

child under 12 years of age on divers occasions by touching with his hands her breasts, inner thighs, buttocks, genitalia, and groin; one specification of rape of a child under 12 years of age on divers occasions by penetrating her vulva with his penis; and one specification of rape of a child under 12 years of age by penetrating her genital opening with his finger, all in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920;[1,2] and one specification of indecent conduct, in violation of Article 134, UCMJ, 10 U.S.C. § 934.[3] Appellant's convictions involve sexual misconduct he committed against his stepdaughter, KT. The panel of officer members sentenced Appellant to a dishonorable discharge, confinement for 20 years, forfeiture of all pay and allowances, and reduction to the grade of E-3.

The convening authority deferred all adjudged forfeitures from 6 June 2019 until action, disapproved the adjudged forfeitures at action, and waived mandatory forfeitures for a period of six months after action for the benefit of Appellant's wife and dependent children. Otherwise, the convening authority approved the sentence as adjudged.

On appeal, Appellant raises seven issues: (1) whether the military judge erred in admitting evidence under Mil. R. Evid. 414 for propensity purposes that did not meet the standard for admission and was more prejudicial than probative; (2) whether the military judge erred by failing to suppress evidence illegally obtained from Appellant's phone, and whether a subsequent warrant, issued nearly two years later to search that same device for evidence already known, was unreasonable under the Fourth Amendment;[4] (3) whether trial

---

[1] The conduct underlying the three specifications in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 820, occurred between 1 October 2007 and 27 June 2012. Thus, Article 120, UCMJ, as amended by the National Defense Authorization Act for Fiscal Year 2006, Pub. L. No. 109-163, § 552, 119 Stat. 3136, 3257 (6 January 2006), applied to Appellant's conduct. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), App. 28, at A28–1.

[2] Regarding the specification alleging Appellant raped KT by penetrating her genital opening with his finger on "divers occasions," the military judge, pursuant to Rule for Courts-Martial 917, *sua sponte*, found Appellant not guilty of the words "on divers occasions." Another specification charged under Article 120, UCMJ, and two specifications under Article 134, UCMJ, were withdrawn and dismissed after arraignment.

[3] Unless otherwise noted, all other references in this opinion to the Uniform Code of Military Justice (UCMJ), Rules for Courts-Martial, and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), including Appendix 28.

[4] U.S. CONST. amend. IV.

defense counsel's numerous pretrial and trial errors cumulatively deprived Appellant of his right to effective assistance of counsel[5] guaranteed by the Sixth Amendment;[6] (4) whether Appellant was subject to unlawful pretrial punishment in violation of Article 13, UCMJ, 10 U.S.C. § 813; (5) whether the evidence underlying his convictions under Charge I of the Article 120, UCMJ, offenses are legally and factually insufficient; and (6) whether trial counsel committed prosecutorial misconduct by using the word "grooming" in his closing argument and presentencing. We also identify and resolve an additional point of contention raised by Appellant, in that (7) he asserts he "was instructed to not testify on [his] own behalf."[7,8]

As to Appellant's fourth claim that he was subjected to unlawful pretrial punishment, we note that in presentencing, Appellant denied being punished in any way prior to trial in violation of Article 13, UCMJ. Nothing in the record suggests Appellant was subjected to illegal pretrial punishment. Appellant is now requesting this court consider matters outside the record. Based on our review, we find this assertion does not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987); *see also United States v. Jessie*, 79 M.J. 437 (C.A.A.F. 2020). As to Appellant's sixth claim that trial counsel committed prosecutorial misconduct by using the word "grooming" in his findings argument, pursuant to *Matias*, we do not find this assertion requires further discussion or warrant relief.[9] Finally, as to his seventh claim, that Appellant was instructed not to testify on his own behalf, the court notes that the military judge specifically asked Appellant, "Was that your personal decision?" Appellant responded, "Yes, your honor." We do not find this assertion requires further discussion or warrant relief.

---

[5] In light of Appellant's claims of ineffective assistance of counsel, we ordered trial defense counsel to provide responsive declarations. *See United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020); *United States v. Ginn*, 47 M.J. 236 (C.A.A.F. 1997).

[6] U.S. Const. amend. VI.

[7] Appellant personally asserts issues (4), (5), (6), and (7) pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[8] Appellant did not expressly identify (7) as an issue, but raised it in the context of whether the evidence underlying his convictions under Charge I of the Article 120, UCMJ, offenses were legally and factually insufficient.

[9] *See United States v. Bressler*, No. ACM 38660, 2016 CCA LEXIS 746, at *78 (A.F. Ct. Crim. App. 16 Dec. 2016) (unpub. op.) (concluding use of the word "grooming," as argued by trial counsel, "was used as a non-scientific term and in a manner easily understood by a lay member").

Finding no error materially prejudicial to Appellant's substantial rights, we affirm the findings and sentence.

## I. BACKGROUND

KT, Appellant's stepdaughter, was born in early 2001 and lived in Alaska until Appellant married her mother, KB, in August 2005. Shortly after they married, Appellant and KB, along with KT and KT's younger half-brother, RM, moved to Little Rock Air Force Base (AFB), Arkansas, where they lived together as a family.[10]

The Government's case against Appellant about his conduct with KT relied primarily on her testimony. When she was about seven years old, Appellant caressed her breasts, inner thighs, and buttocks, over her clothing. KT remembered Appellant touching her after she asked Appellant "what sex was." This happened about once a month when they lived in Arkansas, and usually when they were alone in the home, including when KT was in her bedroom.

In December 2009, the family moved to Pensacola, Florida, and lived on a military installation. KT testified that Appellant continued to touch her inappropriately, which progressed to touching underneath her clothing. KT stated:

> It depended on the time of day and who was in the house, if anybody was in the house. It would usually start off with him saying nothing, coming to me in my bedroom, and either getting onto the bed with me or moving my stuff around to get to me, and he would pull my pants down and start touching my backside and pull my shirt up so that he could see everything and try to remove my clothing as much as possible and it would be rubbing and caressing and trying to like hold me.

KT was nine years old when Appellant began to directly touch her buttocks, breasts, inner thigh, and vagina.

Appellant's sexual activity with KT progressed when he inserted his finger into KT's vagina. Appellant put the tip of one of his fingers into her vagina for a few seconds while they were in her bedroom. KT tried to push his hand away and told him to stop. Appellant stopped when he heard RM return home and enter the home. Appellant then quickly left the room. Until Appellant's conduct became the subject of investigation, KT never told anyone about Appellant touching her, including her mother, with whom she did not have a close relationship.

---

[10] While KB is the biological mother to KT's younger half-brother, RM, Appellant is not his biological father, but Appellant adopted him during the marriage.

KT further testified that, while still in Florida, Appellant raped her when she was around ten or eleven years old. KT stated:

> We had just finished arguing. It had been like I don't know how long since we had argued and then we left it and I went into my room. Then he came into my room, he didn't say anything at all, I believe I was doing my makeup or messing with my makeup or something and I got up and he started to undress me and I tried to push him away from me and get his hands off of me. He pulled my shirt off and pulled my pants off, pulled the rest of my clothing off, and I end up on the bed. I tried to get off the bed and he pulled his pants down quickly and flipped me to where I was on my back and then he started to rape me.

KT stated she did not really know what Appellant was doing to her when this happened, but she was yelling at him and telling him to stop, which he did not. KT was looking at the ceiling while Appellant was "thrusting [his penis inside her] and trying to hold [her] arms down because [she] was trying to push him off." Appellant ejaculated in her, which feeling she described as "liquid and pain and like my entire lower half was on fire." After he left the room, KT sat in the shower for "probably about an hour." She also saw blood in the shower. Again, KT did not tell anyone what had happened until she disclosed Appellant's conduct to investigators.

KT testified that shortly after Appellant raped her, and when she was in the fifth grade, she went to the Naval Exchange (NEX) to buy a pregnancy test, as she had already started her menstrual cycle and learned about pregnancy at school. She went to the NEX with her friend, AP. KT took the pregnancy test in a bathroom at the NEX; the results were negative.

A couple of months later, Appellant again raped KT in her bedroom. Much like the first time, they had been arguing, and afterwards, he entered her room:

> He again starts taking off my clothing. This time I was trying harder to get him to stop and we were kind of fighting back and forth. It started with the shirt, he got the shirt off, I tried to run away, and then he got my pants down and he threw me onto the bed that time and flipped me over onto my back and the same thing happened.

When Appellant was on top of her, he was naked. Like the first time, KT felt Appellant thrusting his penis inside of her, and he eventually ejaculated inside her; she could feel his ejaculate "running down [her] leg." KT again did not tell anyone because "she was terrified."

In May 2012, after finishing fifth grade, KT moved back to Alaska to live with her maternal grandparents. Appellant and KB were officially divorced a month later in June 2012, and shared custody of RM after the divorce. Appellant eventually remarried. In 2013, KT left Alaska to live with her mother, but returned to Alaska in May 2017 to again live with her grandparents.

Soon after moving back to Alaska, KT underwent counseling. During a session in October or November 2017, KT disclosed that she had been sexually assaulted by Appellant. An investigation into her allegations and Appellant's conduct was initiated in December 2017 during which KT disclosed the scope of Appellant's sexual abuse.

## II. DISCUSSION

### A. Evidence Admitted Under Mil. R. Evid. 414

#### 1. Additional Background

On 26 August 2016, Appellant met a person he thought was a girl through the internet platform MeetMe. The person informed Appellant that she was a 15-year-old named "Sam." Appellant disclosed he was 36 years old, and explained that he could not engage in a "sexting" relationship because she was only 15 years old. Nonetheless, the conversation quickly escalated, and despite Appellant's concern—expressed after the fact—that he was being "set up," Appellant and "Sam" texted back and forth, with Appellant sending, requesting and receiving sexually explicit pictures. Some of the messages Appellant sent "Sam" included "show me your p*ss[y] first," "you stick c*ck inside p*ssy," "wow your p*ssy is beautiful," "you have to work for this c*ck," and "will you make me a video while you rub and finger it."

Nearly four hours after "Sam" and Appellant began texting, an individual claiming to be "Sam's" "father" contacted Appellant and told him "if you don't contact me immediately I'm contacting the Charleston [C]ounty [S]heriff's [D]epartment[.] You stand a better chance of straighten[ing] this mess out with me th[a]n [with] my [w]ife, call me." Appellant replied and said he would call "Sam's" father.

The same day "Sam's" "father" instructed Appellant to call him, Appellant told his wife about his communications with "Sam."[11] Appellant explained he was "sexually frustrated" and had "downloaded a phone application." Appel-

---

[11] Information in this paragraph is derived from the military judge's findings of fact from his ruling on the defense motion to suppress. The military judge's findings of fact are supported by the record and we adopt them for our analysis.

lant said he asked a female to send him nude photographs and she did. Although he initially thought "Sam" was 19 years old based on her profile, the female told Appellant that she was 15 years old. Appellant admitted to his wife he had asked the girl to send him nude photographs and the girl had done so. Appellant told his wife of his behavior because "Sam's" "father" found out what Appellant had done and threatened to report Appellant to law enforcement unless he paid him $2,500.00. Appellant admitted to his wife he was communicating with a 15-year-old girl and deleted all photographs, texts, and phone numbers related to his communication with "Sam" and her "father." The "father" continued to call Appellant and demand money. Appellant gave his phone to his wife, who later the same day contacted Appellant's supervisor, Senior Master Sergeant (SMSgt) EM, relaying substantially the same information that Appellant provided to his wife. SMSgt EM contacted the unit's First Sergeant, who in turn contacted the Air Force Office of Special Investigations (AFOSI). AFOSI agents subsequently interviewed Appellant's wife, who recounted what Appellant told her.

Later in the day on 26 August 2016, after AFOSI agents interviewed Appellant's wife, the agents sought and received verbal search authorization from a military magistrate to seize Appellant's phone and to search for any media or communications related to child pornography or sexual abuse of a child. A written search authorization was issued two days later. An extraction of the phone revealed no evidence or images that could be considered child pornography; Appellant had deleted the MeetMe application.

Early in 2018, after KT came forward with her allegations against Appellant, AFOSI agents sought and received a second search authorization to search Appellant's phone. At trial, the Government introduced evidence related to Appellant's communications with "Sam" under Mil. R. Evid. 414 to show Appellant had a propensity to commit the charged sexual crimes against KT.[12]

## 2. Law

Mil. R. Evid. 414 permits the admission of evidence of a prior act of "child molestation" to show propensity to commit a charged act of "child molestation." A military judge's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *United States v. McElhaney*, 54 M.J. 120, 129 (C.A.A.F. 2000) (citing *United States v. Schlamer*, 52 M.J. 80, 84 (C.A.A.F. 1999); *United States v. Johnson*, 46 M.J. 8, 10 (C.A.A.F. 1997)). While we review a military judge's decision to admit evidence for an abuse of discretion, the threshold

---

[12] There is nothing in the record regarding the identity of "Sam" or her "father." The record is silent whether Appellant was disciplined for his conduct.

question with respect to the admissibility of the evidence in this case—whether the evidence constitutes evidence that Appellant committed another offense of "child molestation" under Mil. R. Evid. 414—is one of law, reviewed de novo. *See United States v. Yammine*, 69 M.J. 70, 73 (C.A.A.F. 2010) *(*citing *United States v. DeCologero*, 530 F.3d 36, 58 (1st Cir. 2008)).

An offense of "child molestation" means "an offense punishable under the Uniform Code of Military Justice, or a crime under federal law or the law of a state," that involves, *inter alia*, "any conduct or attempted conduct prohibited by Article 120[, UCMJ, 10 U.S.C. § 920,] and committed with a child . . . ." *See* Mil. R. Evid. 414(d)(2)(A), (G) (2016 *MCM*). The rule establishes a presumption in favor of admitting evidence of prior similar crimes in child molestation cases to show an appellant's predisposition to commit the designated crimes under the rule. *United States v. Tanner*, 63 M.J. 445, 448 (C.A.A.F. 2006) (citing *United States v. Wright*, 53 M.J. 476, 482–83 (C.A.A.F. 2000)). Before admitting evidence under Mil. R. Evid. 414, a military judge must make three threshold findings: (1) that the accused is charged with an offense of child molestation, (2) that the evidence proffered is evidence of the accused's commission of another offense of child molestation, and (3) that the evidence is relevant under Mil. R. Evid. 401 and 402. *United States v. Ediger*, 68 M.J. 243, 248 (C.A.A.F. 2010); *Wright*, 53 M.J. at 482 (citations omitted).

If the three threshold factors are met, the military judge applies a Mil. R. Evid. 403 balancing test. *Ediger*, 68 M.J. at 248. In *Wright*, our superior court set forth several factors to consider when conducting this test. They include: (1) strength of proof of the prior act ("conviction versus gossip"), (2) probative weight of the evidence, (3) potential for less prejudicial evidence, (4) distraction of the fact finder, (5) time needed for proof of prior conduct, (6) temporal proximity, (7) frequency of the acts, (8) presence or lack of intervening circumstances, and (9) relationship between the parties. *Wright*, 53 M.J. at 482. This list of factors is "neither exclusive nor exhaustive." *United States v. Dewrell*, 55 M.J. 131, 138 (C.A.A.F. 2001). Although the court is not required to make detailed findings of fact under Mil. R. Evid. 403, it is important that the court fully evaluate the evidence and make a clear record of the reason behind its findings. *Id.* (citing *United States v. Guardia*, 135 F.3d 1326, 1331 (10th Cir. 1998)); *see also Wright*, 53 M.J. at 482 (citations omitted). We will give the evidentiary ruling less deference when the military judge does not articulate the balancing analysis on the record. *United States v. Berry*, 61 M.J. 91, 96 (C.A.A.F. 2005). A decision to admit or exclude evidence under Mil. R. Evid. 403 is also reviewed for an abuse of discretion. *McElhaney*, 54 M.J. at 129–30 (citing *United States v. Lake*, 36 M.J. 317, 322 (C.M.A. 1993)).

"The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion." *United States v. Solomon*, 72 M.J. 176, 179

(C.A.A.F. 2013). The challenged action must be "arbitrary, fanciful, clearly unreasonable," or "clearly erroneous." *United States v. Miller*, 46 M.J. 63, 65 (C.A.A.F. 1997) (citation omitted); *United States v. Travers*, 25 M.J. 61, 62 (C.M.A. 1987).

### 3. Analysis

Appellant argues that the propensity evidence of Appellant's communications with "Sam" fails the threshold *Ediger* requirements. We disagree and find the military judge did not abuse his discretion when he admitted Appellant's communications under Mil. R. Evid. 414. In a written ruling, the military judge explained his rationale, applying the three criteria set forth in Mil. R. Evid 414(c). The military judge found: (1) that Appellant was charged with several acts of child molestation; (2) that the proffered evidence was evidence of Appellant's commission of at least an attempt to commit sexual abuse of a child under Mil. R. Evid. 414(d)(2)(A) and (G), in that the evidence showed Appellant "intend[ed] to gratify his sexual desire by communicating with [a person] who[m] he believe[d] to be a female child [named 'Sam'], [and] [Appellant's] propensity to commit offenses of child molestation tend[ed] to make the fact that [Appellant] committed sexual acts and contacts and indecent acts upon KT more probable than without the evidence;" and, (3) in conducting the test for relevance under Mil. R. Evid. 401 and 402, the issue of "[w]hether [Appellant] intended to gratify his sexual desire when [he] allegedly touch[ed] KT and commit[ed] sexual acts and contacts and indecent acts upon KT are facts of consequence in determining the findings in this case."

As to the second part of the *Ediger* "two-step analysis," Appellant argues the propensity evidence fails the balancing test of Mil. R. Evid. 403. *See Ediger*, 68 M.J. at 248. Again, we disagree. Having found this communication met the three threshold criteria, the military judge considered the *Wright* factors and conducted a meaningful Mil. R. Evid. 403 balancing analysis, which considered factors weighing both in favor and against admission of the proffered evidence. The military judged concluded that the frequency of Appellant's communications with "Sam" (the fact that Appellant's act occurred over the course of one day) and his lack of a formal relationship with "Sam" weighed against admissibility. However, the military judge found: (1) the uncharged offense would be proven, in part, by forensic evidence (extracted from Appellant's phone); (2) the strength of the proof was not mere gossip; (3) there was no potential for less prejudicial evidence; (4) the factfinder would not be distracted by the focused testimony and forensic evidence; and (5) the probative weight of Appellant's propensity to commit offenses of child molestation, and the evidence of his intent to gratify his sexual desires with a child, all weighed in favor of admissibility. The military judge noted that although Appellant's communication with "Sam" happened over nine years after the earliest charged offense against KT,

"the temporal proximity between the charges and the other offense of child molestation [was] not unreasonable or prohibitively long."

Ultimately, the military judge ruled "the probative value of this presumptively admissible evidence is not *substantially* outweighed by the dangers of unfair prejudice." Where a military judge conducts a proper Mil. R. Evid. 403 balancing test and articulates his analysis on the record, "the ruling will not be overturned unless there is a 'clear abuse of discretion.'" *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000). Based on the facts presented, we find the military judge did not abuse his discretion in allowing the Mil. R. Evid. 414 evidence to be admitted.

## B. Motion to Suppress Evidence Obtained from Appellant's Cell Phone Related to His Workplace Masturbation

### 1. Additional Background

In addition to the crimes committed against his stepdaughter KT, Appellant was also charged with indecent conduct. In the summer of 2016, Appellant video-recorded himself masturbating at his workplace while in uniform; that video was discovered when AFOSI agents conducted their search of his phone while searching for evidence related to child pornography or sexual abuse of "Sam." This misconduct is the crux of Charge II and its Specification. Trial defense counsel sought to suppress the video of Appellant masturbating at work from being introduced, arguing that AFOSI agents went beyond the parameters of the authorization to search Appellant's phone. The military judge denied this motion. On appeal, Appellant renews his objection that the military judge should have suppressed this video because it was illegally obtained and the military judge abused his discretion by admitting this evidence.

On 26 August 2016, the day Appellant communicated with "Sam" and later disclosed those communications to his wife, AFOSI agents sought a verbal search authorization from a military magistrate to seize Appellant's phone and to search the entire phone for any media or communications related to child pornography or sexual abuse of a child. The military magistrate found probable cause to search Appellant's phone for evidence relating to "Sam" or her "father," and granted agents authorization to search the entire phone for videos, text messages, or photographs related to the case. Pursuant to this verbal authorization, AFOSI agents used the Cellebrite Universal Forensic Extraction Device (UFED) to extract the data on Appellant's phone.[13]

---

[13] According to Special Agent KC, a UFED is an "extraction electronic device that extracts cell phone data. It doesn't make a mirror image of [a phone], it just extracts all

Before searching the extracted data for evidence of child pornography or sexual abuse of a child, Special Agent KC, on 29 August 2016, drafted an Air Force Form 1176, *Authority to Search and Seize*, to document and memorialize the verbal search authorization, allowing AFOSI to seize, copy, and analyze "*All phone calls, text messages, and messaging platform records related to third party applications concerning indecent photos of a minor.*" (Emphasis added). In the agent's supporting affidavit, he stated that Appellant's phone contained "explicit information and nude images within its files;" Appellant used the application MeetMe, and while using the application, he accepted nude images and requested photos from the underage female; and, after disclosing the information to his wife, Appellant deleted the text messages and photographs on the device shared between Appellant and the female identified as "Sam." This authorization was signed by the same military magistrate who authorized the verbal search authorization.

Special Agent KC testified that the Cellebrite program created an extraction report, which generates subfolders for the investigator, and in order to go into any other folder the report generates, the agent would have to proactively click the hyperlinks in the folder. When stated by trial defense counsel that the agents had no authority to click on the video folder, Special Agent KC did not agree with that premise. Special Agent KC later told the military judge that the verbal authorization allowed agents to "search the phone . . . for images of child pornography, communications with a minor, anything explicit, content with a minor." Moreover, his understanding from the magistrate was that the agents were not just limited to looking at photographs, despite the fact that when both the 26 August 2016 verbal and 29 August 2016 written search authorizations were granted, there was no indication Appellant had sent videos or exchanged videos with "Sam."

In September 2016, with the written authorization in hand, Special Agent JR conducted a search of the UFED extraction report that was obtained from Appellant's phone. Special Agent JR testified that the aforementioned MeetMe application transmits pictures, videos, and text messaging, and therefore, he believed he had the authorization to search in all three media. Special Agent JR stated that he searched the extraction report video section because "anything involving that messaging platform . . . could be anything from a text to a picture to an emoji to a video," and he wanted to check the folder to make sure

---

data that it can." The agent noted that because every phone is different, the data that can be extracted depends on the phone. He testified, "There's times you'll hook up a certain phone and it won't pull at all. . . . As far as what data it will pull[,] it will pull deleted files, not always[,] but for the most part."

they were not missing anything concerning the MeetMe application. Special Agent JR stated,

> I was looking in the video file because as I read the [Air Force Form] 1176 of what I'm authorized and have probable cause to search for, knowing that messaging platform records to mean for any application, it could be an image, video, picture . . . or simple text message. I wanted to look and make sure there was nothing sent via video, you know, through a message essentially that wasn't popping up.

Special Agent JR opened the video folders and discovered that on two occasions, while at his regular duty location at Joint Base Charleston, South Carolina, and during duty hours while in uniform, Appellant video-recorded himself masturbating in his immediate work space and in the unit's restroom.[14] Investigation revealed the incidents occurred in the summer of 2016, but did not reveal any witnesses to the acts. Once Special Agent JR saw the videos, he advised his leadership what he found.[15]

The UFED extraction revealed no evidence or images that could be considered child pornography. AFOSI agents sent Appellant's phone to the Department of Defense Cyber Crime Center (DC3) laboratory for further analysis, as the agents sought to recover the deleted information.

In June 2018, after KT came forward with allegations that Appellant had raped her—and nearly two years after the initial search of Appellant's phone—AFOSI agents went back and reviewed Appellant's case with respect to his acts of masturbation and determined it was evidence of indecent conduct. Agents sought, and received, a second written authorization to search Appellant's phone, which included a search for "[a]ll images and videos related to third party applications concerning indecent photos of a minor, and *all images and videos relating to [Appellant] engaging in indecent conduct in the workplace.*" (Emphasis added). Appellant argues this search authorization was unreasonable.[16]

---

[14] Appellant was not charged with an offense relating to the restroom video.

[15] Appellant was given a verbal counseling by his commander for masturbating at work after the videos were discovered. The record suggests the counseling occurred before KT came forward with her allegations.

[16] The court notes the genesis of the second written authorization. When trial counsel asked Special Agent KC who suggested the second written authorization, Special Agent KC responded, "You did." In this court's view, Appellant basically argues that

In their motion to suppress, trial defense counsel acknowledged that, based on the information agents provided to the military magistrate regarding Appellant's communication with "Sam," it was lawful and reasonable to search Appellant's phone, specifically the "call log folder," the applications folder, and the "SMS messages folder" (generated from the UFED report) because the first written authorization (29 August 2016) was "very specific." However, trial defense counsel argued that AFOSI agents exceeded the 29 August 2016 written search authorization when they looked into other areas of Appellant's phone, specifically the *videos* folder from the UFED report, which led to the discovery of Appellant's workplace masturbation videos.

In his ruling, the military judge found that

> [a]gents were authorized to search the entire phone for evidence related to the offenses of child pornography and sexual abuse of a child. Specifically, the agents were authorized by the terms of the search authorization to search for "all phone calls, text messages, and messaging platform *records related* to third party applications *concerning* indecent photos of a minor." (Emphasis added)
>
> [Appellant's] communications through third party applications, including text messaging, that concerned the indecent photos of a minor could reasonably have been recorded on any media capable of being transmitted by such applications. Accordingly, "media" and their "records related to third party communication applications" reasonably could be found in the "videos" of the UFED report because those videos reasonably could be attached to text messages.[17] [Special Agent R] was reasonably searching videos on the UFED extraction pursuant to a properly scoped

---

the second written search authorization was the Government's attempt to cure any deficiency in the first written search authorization. We do not necessarily disagree; however, given our ruling, we do not believe the second written search authorization was necessary. Further, Appellee argues that trial defense counsel did not challenge that the second written search was unconstitutional, and as such, this court should consider the issue waived, citing *United States v. Blackburn*, 80 M.J. 205, 209 (C.A.A.F. 2020) (citation omitted) ("Suppression arguments not raised at trial are waived under [Mil. R. Evid.] 311(d)(2)(A)."). The Defense did not challenge the validity of the second written search authorization in its motion to suppress, and the military judge did not address the lawfulness of the second written search authorization in his ruling. Appellee argues this court should consider this issue regarding the second written authorization waived. We agree that Appellant waived this issue.

[17] The military judge, in a note in his ruling, found, "In fact, the masturbation video's file path, identified in the UFED report as a 'video,' indicated it was transmitted via MMS text message."

search authorization when he saw the masturbation video. The masturbation video was therefore in plain view.

## 2. Law

### a. *Standard of Review*

We review a military judge's ruling on a motion to suppress for an abuse of discretion, viewing the evidence in the light most favorable to the prevailing party. *United States v. Hoffmann*, 75 M.J. 120, 124 (C.A.A.F. 2016) (citation omitted). A military judge abuses his discretion when: (1) his findings of fact are clearly erroneous; (2) he applies incorrect legal principles; or (3) his "application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). "The abuse of discretion standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *Solomon*, 72 M.J. at 179 (citation omitted).

### b. *Probable Cause and Search Authorizations*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend IV. It requires warrants and search authorizations to particularly describe the place to be searched and things to be seized so that the search will be "carefully tailored to its justifications." *Maryland v. Garrison*, 480 U.S. 79, 84 (1987).

"The Fourth Amendment requires that a search warrant describe the things to be seized with sufficient particularity to prevent a general exploratory rummaging in a person's belongings." *United States v. Richards*, 76 M.J. 365, 369 (C.A.A.F. 2017) (citing *United States v. Carey*, 172 F.3d 1268, 1272 (10th Cir. 1999)). However, "the proper metric of sufficient specificity is whether it was reasonable to provide a more specific description of the items at that juncture of the investigation." *Id.* (citing *United States v. Richards*, 659 F.3d 527, 541 (6th Cir. 2011)). "[I]t is folly for a search warrant to attempt to structure the mechanics of the search and a warrant imposing such limits would unduly restrict legitimate search objectives." *Id.* (citing *United States v. Burgess*, 576 F.3d 1078, 1094–95 (10th Cir. 2009)). The CAAF went on state in *Richards*,

> In charting how to apply the Fourth Amendment to searches of electronic devices, we glean from our reading of the case law a zone in which such searches are expansive enough to allow investigators access to places where incriminating materials may be hidden, yet not so broad that they become the sort of free-for-

> all general searches the Fourth Amendment was designed to prevent.
>
> On one hand, it is clear that because criminals can—and often do—hide, mislabel, or manipulate files to conceal criminal activity, a broad, expansive search of the hard drive may be required . . . . On the other hand, . . . granting the Government a *carte blanche* to search *every* file on the hard drive impermissibly transforms a "limited search into a general one." *United States v. Stabile*, 633 F.3d 219, 237 (3d Cir. 2011) (citations omitted).

*Id*. at 370.

Data stored within a cell phone falls within the Fourth Amendment's protection. *United States v. Wicks*, 73 M.J. 93, 99 (C.A.A.F. 2014).

Appellant argues there was no probable cause to search for videos on Appellant's phone. Under Mil. R. Evid. 315(f)(1), a military search authorization "must be based upon probable cause." Probable cause exists when there is a reasonable belief that the person, property, or evidence sought is located in the place to be searched. Mil. R. Evid. 315(f)(2). "Reasonable minds frequently may differ on the question whether a particular affidavit establishes probable cause, and we have thus concluded that the preference for warrants is most appropriately effectuated by according great deference to a magistrate's determination." *United States v. Leon*, 468 U.S. 897, 914 (1984) (internal quotation marks and citations omitted). "Close calls will be resolved in favor of sustaining the magistrate's decision." *United States v. Monroe*, 52 M.J. 326, 331 (C.A.A.F. 2000) (quoting *United States v. Maxwell*, 45 M.J. 406, 423 (C.A.A.F. 1996)).

A search authorization should not be found invalid by analyzing the underlying affidavit "in a hypertechnical, rather than a commonsense, manner." *United States v. Clayton*, 68 M.J. 419, 423 (C.A.A.F. 2010) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (citations omitted). In assessing the reasonableness of a search, we weigh the degree of the intrusion of the person's privacy against the degree to which the search promotes a legitimate governmental interest. *United States v. Gurczynski*, 76 M.J. 381, 386 (C.A.A.F. 2017) (citing *Riley v. California*, 573 U.S. 373, 385 (2014)).

When reviewing a search authorization, we "do not review a probable cause determination de novo;" rather we assess whether "the authorizing official had a 'substantial basis' for finding probable cause." *Hoffmann*, 75 M.J. at 125 (citation omitted). "A substantial basis exists 'when, based on the totality of the circumstances, a common-sense judgment would lead to the conclusion that there is a fair probability that evidence of a crime will be found at the identified

location.'" *United States v. Nieto*, 76 M.J. 101, 105 (C.A.A.F. 2017) (quoting *United States v. Rogers*, 67 M.J. 162, 165 (C.A.A.F. 2009)). We give "great deference" to the magistrate's probable cause determination because of "the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Id.* However, this deference is "not boundless," and a reviewing court may conclude that "the magistrate's probable-cause determination reflected an improper analysis of the totality of the circumstances." *Id.* (citing *Leon*, 468 U.S. at 915). Probable cause requires the demonstration of "a sufficient nexus between the alleged crime and the specific item to be seized." *Id.* at 106. (citations omitted). In conducting this review, we look to the information that the authorizing official had at the time he made his decision. *United States v. Cowgill*, 68 M.J. 388, 391 (C.A.A.F. 2010) (citations omitted).

We ordinarily afford the magistrate's determination of probable cause great deference, but we recognize three exceptions to this general rule: (1) when the affidavit upon which the determination was based was prepared with knowing or reckless falsity; (2) when the magistrate is not neutral and detached or is serving as "a rubber stamp" for the police; or (3) when the affidavit fails to provide a substantial basis for a finding of probable cause or the determination is "a mere ratification of the bare conclusions of others." *United States v. Carter*, 54 M.J. 414, 419 (C.A.A.F. 2001) (quoting *Leon*, 468 U.S. at 914–15).

Searches conducted after obtaining a warrant or authorization based on probable cause are presumptively reasonable whereas warrantless searches are presumptively unreasonable unless they fall within "a few specifically established and well-delineated exceptions." *Hoffmann*, 75 M.J. at 123–24 (internal quotation marks omitted) (quoting *Wicks*, 73 M.J. at 99).

*Riley v. California* is a seminal case addressing cell phones. "[M]odern cell phones . . . are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy. . . . [as] a significant majority of American adults now own such phones." 573 U.S. at 385. The Supreme Court went on to explain,

> Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans "the privacies of life." The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought.

*Id.* at 403 (citation omitted).

In *United States v. Osorio*, this court addressed requirements regarding search warrants for computers—and by extension for stored electronic or digital media—when evidence of another crime is discovered, stating,

> [T]here must be specificity in the scope of the warrant which, in turn, mandates specificity in the process of conducting the search. Practitioners must generate specific warrants and search processes necessary to comply with that specificity and then, if they come across evidence of a different crime, stop their search and seek a new authorization.

66 M.J. 632, 637 (A.F. Ct. Crim. App. 2008).

### c. *Unlawful Searches and Good Faith*

Evidence obtained as a result of an unlawful search is inadmissible against the accused if the accused: (1) makes a timely objection; (2) has an adequate interest, such as a reasonable expectation of privacy, in the person, place, or property searched; and (3) exclusion of such evidence "results in appreciable deterrence of future unlawful searches . . . and the benefits of such deterrence outweigh the costs to the justice system." Mil. R. Evid. 311(a)(3).

For the good faith exception to apply, the Government must establish that law enforcement's reliance on a defective authorization is "objectively reasonable." *Hoffmann*, 75 M.J. at 127. The Government has the burden of establishing by a preponderance of the evidence the following: (1) the seizure resulted from a search and seizure authorization issued, in relevant part, by a magistrate; (2) the magistrate had a substantial basis for determining probable cause existed; and (3) law enforcement reasonably and in good faith relied on the authorization. Mil. R. Evid. 311(c)(3), (d)(5)(A); *Nieto*, 76 M.J. at 107; *see also Carter*, 54 M.J. at 420 (citation omitted).

The second requirement of "substantial basis" is met if the person executing the search "had an objectively reasonable belief that the magistrate had a 'substantial basis' for determining the existence of probable cause." *Perkins*, 78 M.J. 381, 387 (quoting *Carter*, 54 M.J. at 422). The question is "'whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" *Herring v. United States*, 555 U.S. 135, 145 (2009) (quoting *Leon*, 468 U.S. at 922 n.23). We further "consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination." *Leon*, 468 U.S. at 923 n.24.

The United States Supreme Court has identified four circumstances in which the "good faith exception" will not apply: (1) where the magistrate "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) where the magistrate "wholly abandoned his judicial role;" (3) where the warrant was

based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;" and (4) where the warrant is so "facially deficient . . . in failing to particularize the place to be searched or the things to be seized . . . that the executing officers cannot reasonably presume it to be valid." *Id.* at 923 (citations omitted). The United States Court of Appeals for the Armed Forces has harmonized these four exceptions with the three requirements under Mil. R. Evid. 311(c)(3) by finding *Leon*'s first and third exceptions to be incorporated in Mil. R. Evid. 311(c)(3)'s second prong (magistrate having a substantial basis) and *Leon*'s second and fourth exceptions to be incorporated in Mil. R. Evid. 311(c)(3)'s third prong (good faith reliance on the search authorization). *Carter*, 54 M.J. at 421.

The Supreme Court spoke in detail on application of the exclusionary rule in *Herring*. The Court stated,

> The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies. Indeed, exclusion "has always been our last resort, not our first impulse," and our precedents establish important principles that constrain application of the exclusionary rule. . . . [T]he exclusionary rule is not an individual right and applies only where it "result[s] in appreciable deterrence." We have repeatedly rejected the argument that exclusion is a necessary consequence of a Fourth Amendment violation. Instead we have focused on the efficacy of the rule in deterring Fourth Amendment violations in the future.

555 U.S. at 140–41 (second alteration in original) (internal quotation marks and citations omitted).

Regarding the deterrence of future unlawful searches, the benefits "must outweigh the costs." The Supreme Court has

> never suggested that the exclusionary rule must apply in every circumstance in which it might provide marginal deterrence. [T]o the extent that application of the exclusionary rule could provide some incremental deterrent, that possible benefit must be weighed against [its] substantial social costs. The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free—something that offends basic concepts of the criminal justice system. [T]he rule's costly toll upon truth-seeking and law enforcement objectives presents a high obstacle for those urging [its] application.

*Id.* at 141–42 (alterations in original) (internal quotation marks and citations omitted).

### d. Plain View

The plain view doctrine may "not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Arizona v. Hicks*, 480 U.S. 321, 328 (1987) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)). Under *Horton v. California*, 496 U.S. 128, 136–37 (1990), in order for the plain view exception to apply: (1) the officer must not violate the Fourth Amendment in arriving at the spot from which the incriminating materials can be plainly viewed; (2) the incriminating character of the materials must be immediately apparent; and (3) the officer must have lawful access to the object itself.

### 3. Analysis

We find that the facts articulated in the military judge's ruling on the motion to suppress were not clearly erroneous, and we find that his conclusions of law are correct.

Acting on information obtained from Appellant's wife on 26 August 2016, AFOSI agents sought a verbal authorization from a military magistrate to seize Appellant's phone. Additionally, the agents were granted authorization to search the *entire* phone for any media or communications on the phone related to child pornography or sexual abuse of a child. We agree with the military judge that the military magistrate had a substantial basis for finding probable cause to grant the seizure and search of the phone. Even though the agents provided the magistrate with limited, yet specific, known facts, all of which came from Appellant's wife, there was no evidence challenging the credibility of the information.

Where this issue turns is the actual search of the phone in September 2016, and whether it was reasonable for agents to search in the videos folder. We believe it was. When searching the folder, agents relied on the verbal authorization, which allowed them to look at all "media." The military judge found the first written search authorization did not limit or otherwise curtail the authority verbally granted on 26 August 2016.

Appellant tries to make the distinction between images and videos. We recognize some would view videos as being different from images; even the Government made this distinction in its second written search authorization. Whether there is a distinction or not, does not affect this court's analysis of this issue; videos are a series of still images.

We also do not find any issues with specificity. Had the military magistrate authorized a blanket search of the entire phone, given the limited number of facts presented, specificity would be a concern. Here, the search was limited to

media relating to the MeetMe application, and again, we agree with the military judge in that it was reasonable to search the videos folder, given the types of files that can be transmitted through that third-party application. Special Agent JR was searching in the videos folder pursuant to a properly scoped search authorization when he saw the masturbation video, and as such, we do not find the military judge's conclusion that Special Agent JR found the video in "plain view while reasonably conducting a lawful search" was erroneous.[18]

The military judge found that even if the video of Appellant masturbating was obtained as the result of an unlawful search, the search of Appellant's phone was conducted pursuant to a properly issued search authorization by a military magistrate, the military magistrate had a substantial basis upon which to find probable cause, and the agents relied on good faith based on the verbal and written search authorizations in conducting their search of Appellant's phone. The testimony by the agents shows that based on their training and experience, they believed they could search the entire phone for all media types, which would have included videos. Having found a proper application of Mil. R. Evid. 311(c)(3), we find that the military judge did not abuse his discretion in admitting the video at issue.[19]

## C. Ineffective Assistance of Counsel Claim

### 1. Additional Background

Appellant asserts that trial defense counsel committed numerous pre-trial errors, which cumulatively deprived him of the effective assistance of counsel.

---

[18] While we find the search authorization in this case lawful, it was not the model of clarity. The confusion over the exact terms and parameters of the military magistrate's oral authorization highlights the danger of using an oral, rather than a written, authorization to search. The oral and written authorizations were somewhat inconsistent: the oral search authorization mentions images, the first written search authorization does not mention images, and the second written search authorization mentions images and videos.

[19] Even if this court found the military judge erred and the video was subject to being excluded, applying the Mil. R. Evid. 311(a)(3) balancing test, we agree with the military judge's conclusion that "no appreciable deterrence of future unlawful searches and seizures would result from the exclusion" of the video. The agents could have been more specific and consistent in the verbal and first written search authorization about what media they could search. However, in this case exclusion of a sexually themed video found while searching for sexually themed "photographs" in a videos folder that could contain videos sent via MeetMe is a remedy unlikely to generate more specificity and consistency in future verbal and follow-up written authorizations. We agree with the military judge's conclusion that "there is no valid policy reason for imposing" such a "drastic sanction." We find agents did not act recklessly and exclusion of this evidence would not deter agents from conducting unlawful searches.

Specifically, Appellant argues his trial defense counsel failed to: (1) impeach false testimony provided by KT regarding her motive for moving to Alaska to live with her grandparents in 2017; (2) impeach KT with her prior falsehoods to law enforcement regarding that motive; (3) object to "irrelevant," "speculative," and "highly prejudicial" testimony regarding the supposed pregnancy test KT took in Pensacola, Florida; (4) move to sever Charge I for a violation of Article 120, UCMJ (specifically related to KT), from Charge II for a violation of Article 134, UCMJ (Appellant's masturbation at work), which resulted in manifest injustice; (5) disagree with the military judge that Appellant attempted to engage in lewd communication with a minor; and (6) take advantage of the military judge's offer to provide the Defense with extra time to make a new argument under Mil. R. Evid. 414, which presented a "radical change in the evidentiary landscape" of the trial. With respect to assertions (5) and (6), these matters occurred during motion hearings.

Trial defense counsel cross-examined KT at length at trial. His questioning challenged KT's ability to accurately perceive things that happened to her; addressed her "vivid dreams;" brought forth an inconsistency about whether she had been raped once or twice; and challenged her various disclosures, or lack thereof, of information to AFOSI that related to Appellant digitally penetrating her, undergoing a pregnancy test, and why she did not tell her mother about what she alleged happened to her. However, KT told the court there was no doubt that Appellant touched her breasts, genitals, buttocks, groin and inner thigh; that he digitally penetrated her vagina; and that he raped her more than once when she was ten years old. KT also stated that at the time of trial, it had been three or four years since she had seen Appellant, and the last time she saw Appellant was when he picked up RM while they were in Jacksonville, Florida. She did not talk to Appellant at this time.

During deliberations, the panel president had two questions for KT. Those questions were aimed at (1) whether she was aware of an investigation or allegations against Appellant, and (2) a description of the events that led her to disclose her allegations to investigators. In a closed court session, KT was recalled to testify, and based on her responses, the military judge allowed her to answer those questions. KT told the members that she was not aware of the investigation, and that she experienced a "traumatic incident," which is why she ended up moving to Alaska to live with her grandparents in 2017.[20] Soon after, she found a therapist that she felt comfortable talking to about Appellant's conduct. The panel president told the military judge they were "struggling" with the "traumatic experience." The military judge advised the panel president that the Military Rules of Evidence precluded that evidence from

---

[20] Details of the "traumatic event" were raised before the military judge in motions.

21

being presented, and that the "traumatic event was not related to the events in this case."

In response to Appellant's claims of ineffective assistance of counsel, we ordered and received declarations from Appellant's trial defense counsel, Major (Maj) NA and Maj RM, which refute each of Appellant's claims.[21]

## 2. Law

We review allegations of ineffective assistance of counsel de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). In order for an appellant to prevail on a claim of ineffective assistance of counsel, he must demonstrate that counsel's performance was deficient and that the deficiency resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

We employ a presumption of competence, and apply a three-part test in assessing whether that presumption has been overcome: (1) "Is there a reasonable explanation for counsel's actions?;" (2) "Did defense counsel's level of advocacy 'fall measurably below the performance . . . [ordinarily expected] of fallible lawyers'?;" and (3) "[I]f defense counsel was ineffective, is there 'a reasonable probability that, absent the errors,' there would have been a different result?" *Gooch*, 69 M.J. at 362 (omission and alteration in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

"Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citing *Gooch*, 69 M.J. at 362–63) (additional citation omitted). In reviewing the decisions and actions of trial defense counsel, this court does not second-guess strategic or tactical decisions. *See United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993) (citations omitted). It is only in those limited circumstances where a purported "strategic" or "deliberate" decision is unreasonable or based on inadequate investigation that it can provide the foundation for a finding of ineffective assistance. *See United States v. Davis*, 60 M.J. 469, 474 (C.A.A.F. 2005).

Under Rule for Courts-Martial (R.C.M.) 906(b)(10), a severance of offenses may be requested by appropriate motion, but "only to prevent a manifest injustice." To determine whether severance is required to prevent manifest in-

---

[21] Since the issue was raised in the record but was not fully resolvable by those materials, the affidavits submitted by the Government and Appellant were considered consistent with *United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020).

justice, the court considers whether the findings reflect an impermissible spill-over of prejudice from one charge to the other; whether the evidence of one offense would be admissible proof of the other; and whether the military judge provided a proper limiting instruction. *United States v. Curtis*, 44 M.J. 106, 128 (C.A.A.F. 1996). The military justice system encourages the joinder of all known offenses at one trial, and permits a motion for "severance of offenses by the military judge, 'but only to prevent manifest injustice.'" *United States v. Southworth*, 50 M.J. 74, 76 (C.A.A.F. 1999) (quoting R.C.M. 906(b)(10)). "In general, 'an abuse of discretion will be found only where the defendant is able to show that the denial of a severance caused him actual prejudice in that it prevented him from receiving a fair trial; it is not enough that separate trials may have provided him with a better opportunity for an acquittal.'" *United States v. Duncan*, 53 M.J. 494, 497–98 (2000) (quoting *United States v. Alexander*, 135 F.3d 470, 477 (7th Cir. 1998)).

### 3. Analysis

We disagree with Appellant's claim that trial defense counsel were ineffective. Appellant's counsel articulated a sound strategy regarding their impeachment of KT about her "traumatic incident," as they were concerned about opening doors that could damage Appellant's case. Maj NA asserted that while KT's statements about the incident contained some inconsistencies, the evidence surrounding that event suggested "something significant, did, in fact, happen to her." Furthermore, Maj NA stated that, based on pretrial interviews, there was evidence to corroborate that the "traumatic" event led KT to move to Alaska. Trial defense counsel strategically chose to not cross examine KT about this issue because they did not want to open the door to the Prosecution introducing further evidence of the incident, which would garner sympathy with the members. Furthermore, trial defense counsel was concerned that if the door was opened for the Prosecution to introduce evidence about the incident, coupled with evidence of KT's inconsistencies when recounting that event, the members would be more willing to overlook KT's inconsistencies when recounting the events of the instant case, thus weakening a key aspect of the defense strategy.

As for the allegation that trial defense counsel failed to impeach KT with her prior falsehoods to law enforcement about the "traumatic incident," Maj NA again asserted that this was a strategic decision. Maj NA noted that there was, in fact, physical evidence of the incident, and that introducing this evidence would "cut against the defense's theory more than it helped." Maj NA further stated after he discussed this issue with their appointed forensic psychologist, trial defense counsel made a tactical decision to avoid this line of questioning to prevent opening the door to "testimony that discussed how therapy for a recent trauma could, in some circumstances, lead to discussions about

past trauma." We do not find that trial defense counsel were ineffective in their efforts to impeach KT.

Appellant argues KT's testimony regarding her pregnancy test was entirely speculative and highly prejudicial, and that trial defense counsel's cross-examination on this issue was ineffective. We disagree. KT testified she felt she needed to take a pregnancy test after Appellant raped her. Either the testimony is true or false, but it is not speculative. Further, trial defense counsel confronted KT on this issue, highlighted her inconsistencies, and asked questions about her failure to disclose anything about the test to AFOSI agents. Further, because AP's testimony contradicted KT's testimony regarding the circumstances surrounding the pregnancy test, Maj NA declared that during closing argument he "emphasized [an] alternate theory about the pregnancy test and the other inconsistencies related to the testimony." Whether the testimony of KT and AP was credible was an issue for the members to decide. Based on review of the record we do not find trial defense counsel was ineffective on this issue.

Appellant argues that trial defense counsel should have moved to sever Charge II from Charge I, and having to defend against both Charge I and Charge II at the same trial led to a manifest injustice. Appellant argues that the only reason Charge II was joined with Charge I "was for its prejudicial effect," and that Charge II contained "patently bad character evidence." However, Appellant only speculates how this resulted in an unfair trial. Given that Appellant's phone was a key piece of evidence for both charges, and that the nature of both charges was sex-related, for simple purposes of judicial economy it is unlikely a motion for severance would have been granted. Trial defense counsel declared that instead of moving to sever the charges, and given the law on this issue, they chose to focus on their evidentiary motions. The military judge also properly provided members with a spillover instruction. We find trial defense counsel's explanation for why they did not seek to sever Charge II from Charge I was reasonable, and we find Appellant suffered no manifest injustice.

Appellant also argues that the evidence Appellant actually attempted to engage in lewd communications was ambiguous, but trial defense counsel conceded that Appellant believed he was communicating with a 15-year-old child. He further argued this allowed the military judge to make an "uncontested finding" regarding whether Appellant committed a prior act of child molestation. To the contrary, the record shows the Defense repeatedly argued to exclude this evidence under Mil. R. Evid. 414. Maj NA also stated the Defense did not concede that Appellant had attempted to engage in lewd communications with a minor, but "continued to assert that, due to the speculative nature of the prosecution's evidence, the court could not properly find that an 'other

offense' of child molestation under Mil. R. Evid. 414 had been committed." Maj RM stated "the defense continuously raised the argument with the military judge about the highly speculative nature of this evidence" given that it was never known with whom Appellant had been conversing. Nonetheless, the record shows trial defense counsel did acknowledge there was probable cause to search Appellant's phone as a result of Appellant's confession to his wife. However, the record also shows trial defense counsel provided strong arguments as to the speculative nature of the resulting evidence, particularly regarding the identities of "Sam" and her "father," even in light of the fact that Appellant admitted to his wife that he had been communicating with a 15-year-old girl, and the evidence associated with his communication. While we do not find that trial defense counsel were ineffective on this issue, even if they had been ineffective, we do not believe there is a reasonable probability there would have been a different result on this issue.

Finally, Appellant contends his trial counsel did not take advantage of the military judge's offer to provide the Defense with extra time to make a new argument under Mil. R. Evid. 414, which presented a "radical change in the evidentiary landscape" of the trial, and this extra time "may have brought a different result" to the trial. We find no merit to this assertion. Initially, the Government intended to offer the evidence related to "Sam" under Mil. R. Evid. 404(b). However, after arraignment, trial counsel informed the military judge that they were seeking admission of the evidence under Mil. R. Evid. 414, as an offense of child molestation under Article 120, UCMJ. Trial defense counsel, being familiar with the offenses at issue and the evidence in the case, deemed an extended recess was not necessary, and that they were fully able to address the Government's new argument without additional delay. Appellant has failed to demonstrate a delay would have or could have resulted in a different result.

Trial defense counsel could have chosen a different strategy on each of these issues; however, the record shows their trial strategy on each point in this case was not unreasonable, especially given their valid concerns about opening doors that could have negatively impacted Appellant's case, the current state of the law, and the military judge's ruling on their motions. Their preparation, motions filings, cross-examination, and strategy brought relevant information to the attention of the panel, and actually led to some allegations being withdrawn.[22] We evaluate trial defense counsel's performance not by the

---

[22] A specification charged under Article 120, UCMJ, and two specifications under Article 134, UCMJ, were also withdrawn and dismissed after arraignment.

success of their strategy, "but rather whether counsel made . . . objectively reasonable choice[s] in strategy from the alternatives available at the [trial]." *Dewrell*, 55 M.J. at 136 (quoting *United States v. Hughes*, 48 M.J. 700, 718 (A.F. Ct. Crim. App. 1998), *aff'd*, 52 M.J. 278 (C.A.A.F. 2000)). Under these circumstances, Appellant fails to overcome the strong presumption that counsel's performance was within the wide range of reasonable professional assistance.

## D. Legal and Factual Sufficiency as to Charge I and its Specifications

### 1. Law

A Court of Criminal Appeals may affirm only such findings of guilty "as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(c), UCMJ, 10 U.S.C. § 866(c). "Article 66(c) requires the Courts of Criminal Appeals to conduct a de novo review of legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (emphasis and citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses," this court is "convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568

(alteration in original) (quoting *Washington*, 57 M.J. at 399). This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. Article 66(c), UCMJ; *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

For his offenses against KT, Appellant was convicted of one specification of aggravated sexual contact with a child, in violation of Article 120, UCMJ, 10 U.S.C. § 920 (*Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), App. 28, ¶ 45.a.(g) at A28-2, and two specifications of the rape of a child under 12 years of age, in violation of Article 120, UCMJ (2016 *MCM*), App. 28, ¶ 45.a.(b) at A28-1. For the aggravated sexual contact specification,[23] this required the Prosecution to prove two elements beyond a reasonable doubt: (1) that Appellant engaged in sexual contact with KT; and (2) that at the time of the sexual contact, KT had not attained the age of twelve years. *See* 2016 *MCM*, App. 28, ¶ 45.b.(7)(a) at A28-7. Sexual contact is defined as

> the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of another person, or intentionally causing another person to touch, either directly or through the clothing, the genitalia, anus, groin, breast, inner thigh, or buttocks of any person, with an intent to abuse, humiliate, or degrade any person or to arouse or gratify the sexual desire of any person.

2016 *MCM*, App. 28, ¶ 45.a.(t)(2) at A28-3.

For the rape of a child under 12 years of age, this required the Prosecution to prove two elements beyond a reasonable doubt: (1) that Appellant engaged in a sexual act with a child; and (2) that at the time of the sexual act, KT had not attained the age of twelve years.[24] *See* 2016 *MCM*, App. 28, ¶ 45.b.(2)(a) at A28-5. The term "sexual act" means

> (A) contact between the penis and the vulva, and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight; or

---

[23] Specification 1 of Charge I alleged Appellant committed aggravated sexual contact of KT by touching her breasts, inner thighs, buttocks, genitalia, and groin with his hands.

[24] Specification 3 of Charge I alleged Appellant raped KT by penetrating her genital opening with his finger; Specification 4 of the same charge alleged Appellant raped KT by penetrating her vulva with his penis on divers occasions.

(B) the penetration, however slight, of the genital opening of another by a hand or finger or by any object, with an intent to abuse, humiliate, harass, or degrade any person or to arouse or gratify the sexual desire of any person.

2016 *MCM*, App. 28, ¶ 45.a.(t)(1)(A), (B) at A28-3.[25]

### 2. Analysis

Appellant's primary argument against factual sufficiency is that there was no physical evidence to support the findings. In fact, there was no physical evidence, no other witnesses to Appellant's crimes, and little to corroborate KT's testimony about the details of the offenses. As such, the strength of the Government's proof rested on KT's credibility and demeanor at trial. As the Supreme Court noted in *Weiler v. United States*:

> In gauging the truth of conflicting evidence, a jury has no simple formulation of weights and measures upon which to rely. The touchstone is always credibility; the ultimate measure of testimonial worth is quality and not quantity. Triers of fact in our fact-finding tribunals are, with rare exceptions, free in the exercise of their honest judgment, to prefer the testimony of a single witness to that of many.

323 U.S. 606, 608 (1945). This court will not speculate as to what facts in KT's testimony led to the panel's determination of Appellant's guilt; however, in assessing legal sufficiency, we are limited to the evidence produced at trial and are required to consider it in the light most favorable to the Government. KT testified that Appellant penetrated her vagina with his penis on two occasions and with his finger, and also touched her breasts, inner thighs, buttocks, genitalia, and groin with his hand. We conclude a rational factfinder could have found beyond a reasonable doubt all the elements to support Appellant's convictions of sexual assault against KT. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced

---

[25] Although there was no evidence contradicting that KT was under the age of 12 when the offenses occurred, in a prosecution for violation of 10 U.S.C. § 920(b) or 10 U.S.C. § 920(g), it need not be proven that an appellant knew that the other person engaging in the sexual act, contact, or liberty had not attained the age of 12 years, nor is it an affirmative defense that an appellant reasonably believe the other person had attained the age of 12 years. *See* 2016 *MCM*, App. 28, at A28–2.

of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's convictions of sexual assault against KT both legally and factually sufficient.

## III. CONCLUSION

The findings and the sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c).[26] Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

---

[26] When the president announced sentence, he stated Appellant was "to forfeit all pay and allowances." However, "total forfeitures" appears on the court-martial order. We order promulgation of a new CMO.